UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MIGUEL MALDONADO, | ) | |
| | ) | No. 08 C 1954 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Hon. Marvin E. Aspen |
| P.O. LENNY PIERRI, P.O. VINCENT STINAR, | ) | |
| P.O. MICHAEL J. GLINES, Individually, and | ) | |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Miguel Maldonado brought a three-count second amended complaint against Defendants Lenny Pierri, Vincent Stinar, Michael Glines, and the City of Chicago, alleging civil rights violations under 42 U.S.C. § 1983 and a related state tort claim. Count I alleges unlawful detention and false arrest against the individual defendants, in violation of the Fourth Amendment of the Constitution of the United States; Count II alleges unreasonable search against the individual defendants, in violation of the Fourth Amendment; and Count III alleges false arrest against all defendants, in violation of Illinois state law. Defendants answered and the parties completed discovery. Presently before us are Defendants' motion for summary judgment on all counts and Plaintiff's motion for summary judgment on Counts I and III. For the reasons stated below, we deny Plaintiff's motion and grant Defendants' motion in part.

1

I.  STATEMENT OF FACTS[1]

On the afternoon of January 24, 2008, Defendants Lenny Pierri and Vincent Stinar, members of the Chicago Police Department, received an anonymous tip through the police dispatch that a Hispanic male in a blue minivan had a gun.  (Def. Facts ¶¶ 6, 13; Pl. Facts ¶ 7.)[2] The tip also indicated the license plate number and location of the minivan.  (Def. Facts ¶¶ 13–14; Pl. Facts ¶ 7.)  From their experience, the officers recognized the location as a heavily gang-infested neighborhood.  (Def. Facts ¶ 11; *see* Pl. Resp. to Def. Facts ¶ 11.)  In response to the tip, Pierri and Stinar drove their unmarked police car toward the location identified in the tip.  (Def. Facts ¶ 9; Pierri Dep. at 17; Stinar Dep. at 38.)  While en route, the officers passed a blue minivan driving in the opposite direction with a license plate number matching the tip.  (Def. Facts ¶ 19; Pl. Facts ¶ 10.)  Plaintiff Miguel Maldonado owned and was driving the minivan. (Def. Facts ¶ 19; *see* Pl. Facts ¶¶ 6–11.)  Pierri and Stinar turned their vehicle around and began following the minivan without activating their emergency equipment.  (Def. Facts ¶¶ 20, 22; *see* Pl. Facts ¶¶ 11–12.)

After a few blocks, Maldonado voluntarily stopped his automobile in the driveway of his father's auto repair shop, and Pierri and Stinar pulled into the driveway behind him.  (Def. Facts ¶¶ 23–24; Pl. Facts ¶¶ 6, 11.)  Pierri and Stinar quickly exited their vehicle, and as Maldonado

---

[1] Unless otherwise noted, the facts described are undisputed.  We primarily rely on the parties' Local Rule 56.1 statements of uncontested facts.

[2] Citations to "Def. Facts" refer to the Defendants' Local Rule 56.1 statement of uncontested facts filed in support of the Defendants' motion for summary judgment.  Citations to "Pl. Facts" refer to the Plaintiff's Local Rule 56.1 statement of uncontested facts filed in support of the Plaintiff's motion for summary judgment.  Citations to "Pl. Add'l Facts" refer to the Plaintiff's statement of additional facts filed in response to the Defendants' motion for summary judgment.

exited his vehicle, Stinar recognized him as a gang affiliate who Stinar on several occasions while on patrol had seen hanging around with other gang members and with whom Stinar had spoken at the scene of a gang-related shooting three or four years prior. (Def. Facts ¶ 26; Stinar Dep. at 25–30.) Maldonado denies having any gang affiliation or being the individual Stinar remembers seeing and speaking with on prior occasions. (Pl. Resp. to Def. Facts ¶ 30.)

Upon exiting the minivan, Maldonado saw Pierri and Stinar standing outside their unmarked car with their guns drawn and pointed at him. (Def. Facts ¶ 26; Pl. Facts ¶ 13.) Stinar identified himself as a police officer and ordered Maldonado to raise his hands; Maldonado complied and had no visible weapon. (Def. Facts ¶ 27; Pl. Fact. ¶ 13; Stinar Dep. at 45–47; Maldonado Dep. at 43, 46.)

Stinar approached Maldonado to search him. (Def. Facts ¶¶ 28–29, 31; Pl. Facts ¶ 16; Maldonado Dep. at 47; Stinar Dep. at 45–50.) He repositioned Maldonado so that Maldonado faced the minivan with his hands placed on it. (Maldonado Dep. at 47; *see* Stinar Dep. at 49.) Stinar holstered his weapon and patted the exterior of Maldonado's clothing, searching for weapons. (Def. Facts ¶ 31; Maldonado Dep. at 48–49, 120.) According to Maldonado, Stinar also reached inside Maldonado's pants, briefly shaking Maldonado's crotch area and pulling down Maldonado's pants a few inches; Stinar denies doing this. (*Compare* Maldonado Dep. at 120–24 *with* Stinar Dep. at 51.) Finding no weapons, drugs, or other contraband on Maldonado's person, Stinar asked Maldonado about the gun referenced in the anonymous tip, and Maldonado denied having a gun. (Def. Facts ¶ 32–33; Pl. Facts ¶ 22.)

After searching Maldonado's person, Stinar handcuffed Maldonado, handed him off to Pierri, and Pierri placed Maldonado into the locked backseat of their unmarked police car. (Def.

3

Facts ¶¶ 34–35; Pl. Facts ¶ 23.)  In the police car, Pierri asked a handcuffed Maldonado about the gun referenced in the anonymous tip, and Maldonado denied having a gun.  (Def. Facts ¶ 36; Maldonado Dep. at 51.)  As he questioned Maldonado, Pierri checked the police computer to see if Maldonado had any outstanding warrants, which he did not.  (Def. Facts ¶ 37.)

Once Maldonado was secured in the back of the police car, Stinar began searching Maldonado's minivan.  (Def. Facts ¶ 39; Pl. Facts ¶ 26.)  According to Defendants, Maldonado gave Stinar consent to search the minivan; Maldonado denies giving consent.  (*Compare* Def. Facts ¶ 38 *with* Pl. Ex. E, Maldonado Aff. ¶ 3.)  Stinar searched the entire interior of the minivan, as well as under the minivan's hood.  (Stinar Dep. at 57–62; Pl. Add'l Facts ¶¶ 23, 26; Def. Facts ¶ 43.)  Maldonado specifically claims that Stinar searched under the dashboard, inside the interior side panels, and under the carpeting, and that in the process of searching Stinar damaged those parts as well as the glove compartment, seatbelt mechanism holster, radio, and ash tray.  (Pl. Add'l Facts ¶ 24.)  Stinar denies damaging Maldonado's vehicle.  (Stinar Dep. at 57–62.)  During the search, Stinar found no weapons, drugs, or other contraband.  (Pl. Add'l Facts ¶ 27; Def. Facts ¶ 44; Stinar Dep. at 57–62.)

At some point during Stinar's search of the minivan, Defendant Michael Glines, a uniformed Chicago police officer, arrived at the scene in a marked police car.  (Def. Facts ¶¶ 40–41; Pl. Facts ¶ 27.)  Maldonado claims Glines assisted Stinar in searching the van.  (Pl. Facts ¶ 27.)  Confusingly, the Defendants alternately concede that Glines assisted in the search, (Def. Facts ¶ 43; Def. Resp. to Pl. Add'l Facts ¶22), and deny that he did so, (Def. Resp. to Pl. Facts ¶ 27).  The parties appear to agree that Glines did not interact directly with Maldonado.

4

After Stinar (and possibly Glines) finished searching the minivan, Pierri released Maldonado from the backseat and removed his handcuffs. (Def. Facts ¶ 46.) Maldonado testified that he was in the police car for fifteen or twenty minutes. (Maldonado Dep. at 53.) Pierri filled out a "contact card" listing information about the encounter, and the officers departed without further incident. (Def. Facts ¶ 48; *see* Pl. Add'l Facts ¶ 24.)

II.   STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c)(2). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "may not rely merely on allegations or denials in its own pleading" but rather must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

III.     ANANLYSIS

        A.     Fourth Amendment Seizure

The Fourth Amendment of the Constitution of the United States protects individuals against unreasonable searches and seizures. "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Kaupp v. Texas*, 538 U.S. 626, 630, 123 S. Ct. 1843, 1845 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 2387 (1991)). The Supreme Court has recognized two distinct types of seizure: a full arrest and an investigatory *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). Although the line between an arrest and an investigatory stop is often blurry, it is nevertheless important because, to be reasonable under the Fourth Amendment, an arrest requires a higher standard of proof than does an investigatory stop. *See id.* In this case, the parties agree that Maldonado was seized, however they dispute whether that seizure amounted to an arrest or simply a *Terry* stop.

        1.     Arrest or Investigatory Stop

To determine whether a seizure is an arrest, we look at the totality of the circumstances surrounding the seizure, focusing on the extent and duration of any restraint on the suspect's movement. *See Kaupp*, 538 U.S. at 629–30, 123 S. Ct. at 1845–46; *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980); *United States v. Brown*, 233 Fed. App'x 564, 566 (7th Cir. 2007). "A suspect is under arrest when 'a reasonable person in the suspect's position would have understood the situation to constitute restraint on the freedom of movement

of the degree which the law associates with a formal arrest.'" *Brown*, 233 Fed App'x at 567 (quoting *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1017 (7th Cir. 2006) (citing *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999))). Circumstances that indicate an arrest include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1977. Police officers conducting a *Terry* stop, however, are permitted to take appropriate precautions to protect themselves, and the presence of one or more of the circumstances listed above does not necessarily transform the investigatory stop into an arrest. *See Terry*, 392 U.S. at 23, 88 S. Ct. at 1868; *United States v. Mitchell*, 256 F.3d 734, 738 (7th Cir. 2001). For example, an officer may draw his firearm and approach a suspect thought to be armed and dangerous and remain within the bounds of an investigatory stop. *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 684 (1985); *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005); *see also Mitchell*, 256 F.3d at 738 n.6 (collecting cases). Similarly, an officer may detain a dangerous suspect using handcuffs, in a police car, or both without the seizure rising to the level of an arrest. *See Jewett v. Anders*, 521 F.3d 818, 825–27 (2008); *United States v. Stewart*, 388 F.3d 1079, 1084–85 (7th Cir. 2004) ("The permissible scope of a *Terry* stop has expanded in recent years to include the use of handcuffs and temporary detentions in squad cars."); *United States v. Vega*, 72 F.3d 507, 515–16 (7th Cir. 1995). The crucial inquiry is whether the manner of seizure employed by the police was reasonable in light of the circumstances. *See Terry*, 392 U.S. at 20, 88 S. Ct. at 1879 (stating that a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first

7

place.").

Whether the seizure in the present case was an arrest or a stop is a close question. The officers believed Maldonado to be armed and therefore drew their firearms in order to protect themselves. They searched Maldonado but did not uncover a weapon, and then temporarily detained him in handcuffs and in their police car while searching his vehicle. These actions are similar to those employed by police officers in the above cited *Terry* stop cases. However, in the present case, we cannot ignore the presence of every indicator of an arrest listed in *Mendenhall*, quoted above. *See* 446 U.S. at 554, 100 S. Ct. 1977. Several officers were present, originally two and later three. Stinar and Pierri displayed their firearms, physically touched Maldonado, and spoke to Maldonado in a tone that ordered compliance. In addition to these *Mendenhall* indicators, the officers handcuffed and detained a seemingly cooperative suspect who displayed no signs of resistence. Under the circumstances, we conclude that the officers arrested Maldonado.[3]

    2.    Probable Cause

Having determined that Maldonado was arrested, we next turn to whether the officers had sufficient probable cause to perform the arrest. If the officers had probable cause, their seizure of Maldonado was reasonable, and Maldonado's claim fails as a matter of law. "A police officer has probable cause to arrest an individual when the facts and circumstances that are known to him reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007).

---

[3] *See Brown*, 233 Fed. App'x at 567 (stating that it is "preposterous" to argue that a person is not under arrest after he has been restrained by use of force, handcuffed, and locked in a police car).

8

Probable cause is based on the totality of the circumstances surrounding an arrest, *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983), and when assessing probable cause, we view the facts as they were reasonably perceived by the arresting officer, "seeing what he saw, hearing what he heard, and so forth." *Holmes*, 511 F.3d at 679 (citing *Wagner v. Washington Co.*, 493 F.3d 833, 836 (7th Cir. 2007); *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005)). We consider the officer's training and experience as part of the totality of the circumstances. *See id.*; *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006), *cert. denied*, 549 U.S. 874, 127 S. Ct. 183 (2006).

The anonymous tip in this case is central to our analysis. A reliable tip alone can support probable cause. *See Gates*, 462 U.S. at 230, 103 S. Ct. at 2328; *United States v. Harris*, 585 F.3d 394, 401–02 (7th Cir. 2009). However, an unsubstantiated, anonymous tip, without more, cannot support even the reasonable suspicion required to justify a *Terry* stop, *Florida v. J.L.*, 520 U.S. 266, 270–74, 120 S. Ct. 1375, 1378–80 (2000), and thus is clearly insufficient to support the higher standard of probable cause, *see United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989) ("[T]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause."). In *Florida v. JL*, the police received an anonymous tip that a black man wearing a plaid shirt, at a particular location, had a gun. 520 U.S. at 268, 120 S. Ct. at 1377. The police arrived at the location, saw a black man wearing a plaid shirt, and conducted a protective pat-down, finding a gun. *Id.* at 268, 1377. Because the officers' decision to conduct the search was based solely on the anonymous tip, the Supreme Court held that the search was unreasonable. *Id.* at 271, 1379. The Court emphasized that the anonymous tip contained no indicia of reliability, such as information about the tipper's basis of knowledge or

9

facts predicting future events that could be corroborated. *Id.* The tip's "accurate description of a subject's readily observable location and appearance" was of limited value because "reasonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272, 1279.

The tip in the present case is essentially identical to the tip in *Florida v. J.L.*[4] The tip here identified Maldonado as a Hispanic male, physically described his vehicle including license plate, listed the location of his vehicle, and announced that Maldonado had a gun. The tip's details were merely readily observable physical descriptions that provided no indicia of reliability as to whether Maldonado actually possessed a gun. The tip did not reveal the tipper's basis of knowledge or provide predictive elements which could be verified. Therefore, the anonymous tip, by itself, supports neither reasonable suspicion for a *Terry* stop, nor probable cause for an arrest.

But the tip is not meaningless. The holding in *Florida v. J.L.* is limited to situations in which officers have no reason to suspect illegality other than an anonymous tip. *Id*. at 268, 1377 ("Apart from the tip, the officers had no reason to suspect . . . illegal conduct.") When analyzing probable cause, we look at the totality of the circumstances surrounding the arrest, and when those circumstances include information independent of and in addition to an anonymous tip,

---

[4] Defendants argue that this case falls into the so-called "ongoing emergency" exception to the *Florida v. J.L.* rule because gun possession violates Illinois state law and thus is an ongoing crime and not merely an allegation of general criminality. *See, e.g.*, Def. Resp. to Pl. Mot. at 7; *see also United States v. Hicks*, 531 F.3d 555 (7th Cir. 2008) (recognizing an emergency exception for an anonymous tip reporting that an armed man was beating a woman). We disagree. The search in *Florida v. J.L.* was conducted for the exact reason as in this case: the officers believed an individual possessed a gun in violation of state law. 529 U.S. at 268–69, 120 S. Ct. at 1377. Thus, reading the ongoing emergency exception to apply in this case would effectively displace *Florida v. J.L.* in its entirety, a result that cannot stand.

*Florida v. J.L.* does not require us to ignore the tip.

Two additional pieces of information available to the officers at the time of Maldonado's arrest are relevant. First, the location of Maldonado's vehicle as identified in the tip was known to the officers as a heavily gang-infested neighborhood. (Def. Facts ¶ 11; *see* Pl. Resp. to Def. Facts ¶ 11.) The officers' knowledge of the area is relevant in assessing whether the officers reasonably believed that Maldonado had committed or was committing a crime, namely illegal gun possession. *United States v. Jackson*, 300 F.3d 740, 741 (7th Cir. 2002) ("An officer may also consider whether the location of the stop is a 'high crime area.'"); *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999).

Second, and more significantly, as Maldonado exited his vehicle, Stinar immediately recognized him as a gang affiliate and the witness of a gang-related shooting Stinar investigated a few years before.[5] (Def. Facts ¶ 26; Stinar Dep. at 25–30.) An officer's previous experience with an individual and his knowledge of the individual's criminal associations is an appropriate factor for probable cause. *Jackson*, 300 F.3d at 741; *Mitchell*, 256 F.3d at 737. Although Stinar's recognition of Maldonado does not corroborate the tip, his belief—that Maldonado was a gang affiliate who Stinar had personally witnessed hanging around with known gang members

---

[5] As stated above, Maldonado insists that he is not now and never has been affiliated with any gang, and that he is not the person Stinar remembers seeing or speaking with on prior occasions. (*See, e.g.*, Pl. Resp. to Def. Facts ¶ 30.) Maldonado does not, however, argue that Stinar is lying or that Stinar's testimony lacks credibility; he simply asserts that Stinar was mistaken. An officer may rely on a reasonable mistake of fact when deciding whether to make an arrest. *See United States v. Dowthard*, 500 F.3d 567, 569 (7th Cir. 2007); *United States v. McDonald*, 453 F.3d 958, 962 (7th Cir. 2006) (collecting cases). Viewing the facts in the light most favorable to Maldonado, and thus assuming Stinar misidentified Maldonado, Maldonado does not argue that this mistake was unreasonable, nor has he offered any evidence to support such an argument. Therefore we find that Stinar's belief about Maldonado's gang affiliation, whether true or reasonably mistaken, is relevant to the probable cause calculus.

on several occasions and who had been present at the scene of a gang-related shooting—significantly and reasonably increased Stinar's suspicion that Maldonado, consistent with the tip and with Stinar's knowledge of the rough neighborhood, was in possession of an illegal gun.

To summarize, the officers received the anonymous tip of an illegal gun in a vehicle at a specific location, and they immediately began driving toward the identified location. From their experience, they knew this location to be a heavily gang-infested neighborhood, increasing their level of suspicion. They spotted the vehicle identified in the tip and corroborated all physical details listed in the tip, including the vehicle's license plate number. At this point, the officers did not pull the vehicle over, but merely followed it without activating their emergency equipment. When the vehicle voluntarily stopped, the officers also stopped. As the driver exited the vehicle, the officers immediately recognized him as a gang affiliate who was present at the scene of a prior gang-related shooting. At this point, we conclude that the officers had a reasonable belief that the driver, Maldonado, illegally possessed a gun, and thus they had probable cause to arrest him. This moment—when Maldonado exited the vehicle, noticed the officers, and yielded to their show of force—is also when the seizure began. *See California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 1550 (1991) (holding that a seizure begins when by use or show of force police attempt to restrict a subject's freedom of movement and the subject yields). Accordingly, because the officers had probable cause at the outset of the seizure, their arrest of Maldonado was reasonable under the Fourth Amendment.

B. Fourth Amendment Search

Maldonado next asserts that the officers unreasonably searched both his person and his

vehicle. Maldonado alternatively argues either that the officers did not have sufficient cause to search his person or that the otherwise permissible search was nevertheless unreasonable because the officers searched his crotch area. He argues that the vehicle search was unreasonable because the officers searched in impermissible areas of his vehicle—namely in the rear cargo area and under the hood—and conducted the search in an unreasonable and destructive manner.

    1.  Search of Maldonado's Person

  Police may conduct a warrantless search incident to arrest of a suspect's person in order to disarm the suspect and preserve evidence. *Knowles v. Iowa*, 525 U.S. 113, 116, 119 S. Ct. 484, 487 (1998); *United States v. Robinson*, 414 U.S. 218, 325, 94 S. Ct. 467, 477 (1973); *Chimel v. California*, 395 U.S. 752, 762–63, 89 S. Ct. 2034, 2044 (1969). As stated above, the officers lawfully arrested Maldonado, and thus they were entitled to search him—no further justification is required. *See Robinson*, 414 U.S. at 235, 94 S. Ct. at 477 ("It is the fact of the lawful arrest which establishes the authority of the search . . . ."). However, an otherwise permissible search is still unreasonable under the Fourth Amendment if it is conducted in an unreasonable manner. *See Bell v. Wolfish*, 441 U.S. 520, 559–60, 99 S. Ct. 1861, 1884–85 (1979); *Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007).

  Maldonado argues that the police exceeded the permissible scope of a protective pat-down by searching his crotch area. We have already found that Maldonado was arrested pursuant to probable cause, and therefore the search of his person was incident to a lawful arrest and not subject to the restrictions of a protective pat-down. Furthermore, the Seventh Circuit has held that the search of a suspect's crotch area incident to arrest is reasonable if the search is calculated to uncover evidence or a weapon and the suspect's private parts are not exposed to the

13

public. *Brown*, 233 Fed. App'x at 568–69; *see also United States v. Jackson*, 377 F.3d 715 (7th Cir. 2004) (permitting search of crotch area incident to arrest). Maldonado has not claimed that his privates were exposed to the public. In addition, the officers were searching for a gun, which could have been hidden in the crotch area of Maldonado's pants. Thus, we conclude that the search of Maldonado's person was a reasonable, lawful search incident to arrest.

    2. Search of Maldonado's Vehicle

An officer with probable cause may conduct a warrantless search of any part of a vehicle in which contraband or evidence may be hidden. *United States v. Hines*, 449 F.3d 808, 814 (7th Cir. 2006) ("[A] law enforcement officer need not have a warrant to search a vehicle when 'there is probable cause to believe that the search will uncover contraband or evidence of crime.'") (quoting *United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005)); *United States v. Young,* 38 F.3d 338, 340 (7th Cir. 1994). Specifically, with probable cause an officer may search in areas of a vehicle not readily accessible to passengers if the officer has reason to believe evidence could be hidden there. *See United States v. Alexander*, 573 F.3d 465, 475 (7th Cir. 2009) (permitting search under hood); *United States v. Scott*, 516 F.3d 587, 589 (7th Cir. 2008) (permitting search of trunk); *United States v. Johnson*, 383 F.3d 538, 546 (7th Cir. 2004) (same). The police may conduct a vehicle search incident to arrest while a suspect is detained in the back of a police car. *See, e.g.*, *Hines*, 449 F.3d at 814.

Just as the officers had probable cause to arrest Maldonado for possessing an illegal gun, they had probable to search his vehicle to find the gun they reasonably believed to be hidden inside. The anonymous tip did not identify where within the car the gun was hidden, and therefore the officers were permitted to, and did, search in all places where they reasonably

14

believed a gun might be hidden. The most questionable area searched by the officers in this case was under the hood of the minivan. However, Stinar specifically testified in his deposition that he searched under the minivan's hood because from his experience people sometimes hide guns under their vehicles' hoods. (*See* Stinar Dep. at 60–61.) Furthermore, the police may search in a separate trunk area incident to arrest, and thus searching in a rear cargo area of a minivan is clearly permissible. Under these circumstances, we find that the scope of the vehicle search incident to arrest was reasonable.

Maldonado contends, however, that the officers damaged his vehicle while conducting the search. Defendants deny doing so. A vehicle search reasonable in scope may nevertheless be unreasonable if it is conducted in an unreasonable manner. *See United States v. Ramirez*, 523 U.S. 65, 71, 118 S. Ct. 992, 997 (1998); *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). For example, "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment." *Ramirez*, 523 U.S. at 71, 118 S. Ct. at 997. This general principle is clearly established, and a reasonable officer would have known that unnecessary property damage during a search is unreasonable. Thus, a clear violation of this principle would not be shielded by qualified immunity. *See Pearson v. Callahan*, 129 S. Ct. 808, 822 (2009); *Saucier v. Katz*, 533 U.S. 194, 204, 121 S. Ct. 2151, 2158 (2001). Viewing the facts in the light most favorable to Maldonado, a reasonable jury could conclude that the officers excessively and unnecessarily destroyed parts of Maldonado's vehicle, and therefore violated his clearly established Constitutional rights during the search. Thus, we cannot presently determine as a matter of law whether the search was conducted in a reasonable manner and on that basis deny summary judgment on this claim.

C. Illinois False Arrest

Finally, Maldonado asserts a state law false arrest claim against all parties, including the City of Chicago. To succeed on this claim, Maldonado "must show that he was restrained unreasonably or without probable cause." *Reynolds v. Menard, Inc.*, 365 Ill. App. 3d 812, 819, 850 N.E.2d 831, 837 (1st Dist. 2006) (citing *Martel Enters. v. City of Chi.*, 223 Ill. App. 3d 1028, 1034, 584 N.E.2d 157, 161 (1st Dist. 1991) ("Probable cause is an absolute bar to a claim of false imprisonment.")). In other words, because, as described above, the officers in this case acted reasonably and with probable cause when they arrested Maldonado, Maldonado's state law false arrest claim fails. *See Mannoia v. Farrow*, 476 F.3d 453, 459 (7th Cir. 2007) (upholding grant of summary judgment on supplemental state law false arrest claim because officers acted with probable cause).

IV. CONCLUSION

For the reasons stated above, we grant Defendants' motion for summary judgment other than the claim in Count II that Defendants conducted the vehicle search in an unreasonable manner. We deny Plaintiff's motion for partial summary judgment.

It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated: February 1, 2010